Filed 7/22/26  Washington v. City of Los Angeles CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| EDMON WASHINGTON,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF LOS ANGELES, et al.,<br><br>Defendants and Appellants. | B324208<br><br>(Los Angeles County Super. Ct. No. BC698026) |

APPEAL from an order of the Superior Court of Los Angeles County, Mark A. Borenstein, Judge.  Affirmed in part and reversed in part.

The Cochran Firm California and Brian T. Dunn for Plaintiff and Appellant.

Hydee Feldstein Soto, City Attorney, Denise C. Mills, Chief Deputy City Attorney, Kathleen A. Kenealy, Chief Assistant City Attorney, Shaun Dabby Jacobs and Merete Rietveld, Deputy City Attorneys, for Defendants and Appellants.

_____

At the conclusion of a police standoff, Los Angeles Police Department (LAPD) Officer Eric Olive shot Edmon Washington with a round from a 40-millimeter less-lethal launcher.  The round hit Washington in the face, and Washington lost almost all vision out of his right eye as a result.  Washington sued the City of Los Angeles (City) and Olive (collectively, the defendants) for negligence.  The jury returned a verdict in the defendants' favor after a trial.  Washington moved for judgment notwithstanding the verdict (JNOV) and alternatively a new trial, arguing there was insufficient evidence to support the jury's verdict.  The trial court granted a new trial as to the City, concluding the jury should have found the City negligent based on application of the doctrine of res ipsa loquitur.  The court otherwise denied Washington's postjudgment motions.

The City appeals from the order granting the new trial, and Washington cross-appeals from the order denying his JNOV motion.  We affirm the order denying Washington's JNOV motion.  However, we reverse the new trial order and reinstate the jury's verdict as to the City because the trial court's ruling was based on erroneous legal principles.  The trial court erroneously determined the presumption of negligence under res ipsa loquitor principles was unrebutted, despite evidence proffered by the City tending to show it was not negligent or the proximate cause of Washington's harm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Federal Lawsuit and the Underlying Lawsuit*

The incident in which Olive shot Washington with the less-lethal weapon took place in August 2016.[1]  (See *Washington v. City of Los Angeles* (C.D.Cal. Apr. 16, 2018, CV 17-2829 PA) 2018 WL 6131603, p. 1 (*Washington*), affd. (9th Cir. 2020) 791 Fed. Appx. 683.)  After Washington and a companion were seen carrying assault rifles at a protest, LAPD officers tracked Washington as he traveled in a car and entered an underground parking garage, where he remained for several hours.  (*Ibid.*)  During this time, Olive viewed a video showing Washington shouting at the protest, "[W]e gonna blow their heads off!"  (*Ibid.*)

Officers initiated a traffic stop when the car left the garage.  (*Washington, supra,* 2018 WL 6131603, p. 2.)  Washington exited the car but, during a seven-minute standoff, refused to comply with repeated instructions to get on the ground.  (*Ibid.*)  An officer warned Washington that if he did not comply, he would be hit by a projectile from a 40-millimeter less-lethal launcher.  (*Id.* at p. 3.)  When Washington still failed to obey the commands,

---

[1]    The factual circumstances of the events leading up to the underlying incident were excluded at trial but are provided here for context.  We take them from the federal district court decision granting summary judgment on Washington's claim against Olive for civil rights violations under 42 U.S.C. section 1983.  (*Washington v. City of Los Angeles* (C.D.Cal. Apr. 16, 2018, CV 17-2829 PA) 2018 WL 6131603.)

3

Olive fired the launcher and hit Washington just below his right eye. (*Ibid*.)[2]

In 2017 Washington filed a lawsuit in federal district court, alleging an excessive force claim against Olive under 42 U.S.C. section 1983 and battery and negligence claims against the City and Olive under state law. (*Washington*, *supra*, 2018 WL 6131603, p. 1.) The district court granted Olive's motion for summary judgment on the excessive force claim, concluding the force Olive used in firing the launcher was objectively reasonable and thus Olive's conduct did not violate the Fourth Amendment. (*Id*. at p. 6.) The district court declined to exercise supplemental jurisdiction over the state law claims and dismissed them without prejudice. (*Id*. at p. 8.)

In 2018 Washington filed this action in state court, alleging a cause of action for negligence against the City and Olive.[3] Washington alleged Olive failed to exercise reasonable and ordinary care when firing the 40-millimeter less-lethal launcher and the City "negligently acquired, inspected, maintained, and/or tested" the launcher before the incident and inadequately trained and supervised Olive. Washington also alleged the City was vicariously liable for its employees' acts and omissions.

---

[2] Washington was later convicted of a felony for carrying an assault rifle.

[3] Washington also included a battery cause of action in his complaint but later dismissed it in light of the federal court's ruling that the force Olive used was objectively reasonable.

A first trial held in early 2022 on the negligence cause of action resulted in a mistrial after the jury hung.

4

B.    *Trial*

In June 2022 Washington proceeded to trial on his negligence claim.  Washington stipulated that Olive's decision to fire the launcher was justified.  Thus, he agreed not to challenge the "fact of the deployment," but rather to challenge "only the manner of deployment."  He further stipulated he would "advance his negligence cause of action exclusively on the fact that he was shot in the face with the [40-millimeter] launcher, as opposed to an appropriate target area on his person."  The court advised the jury of the limited scope of the negligence theory at the outset of the trial.  After the parties had rested, the court instructed the jury:  "The plaintiff contends that the negligence of Officer Olive caused the projectile to hit Mr. Washington in the eye, or that the [40-millimeter] launcher was negligently maintained, which caused the round to fire at a higher level than Officer Olive intended.  The defendant City … denies that Officer Olive was negligent, and also denies that any of the LAPD personnel were negligent in the care and maintenance of the [40-millimeter] launcher that Officer Olive fired on the day in question."

1.    *Washington's case*

Washington presented three witnesses.  He and an ophthalmologist testified to his injuries.  Washington also called Olive, who testified he was proficient with the 40-millimeter less-lethal launcher and trained not to target certain areas, including the head.  Olive passed the LAPD's qualification exam for the launcher by accurately hitting a series of targets.  He had not fired the launcher in the field before the incident.

Olive did not observe any issues with the launcher before firing it at Washington.  Specifically, when he received the weapon at the start of his shift, Olive inspected it and "check[ed]

5

the sights to make sure that they're there." The weapon was stored inside "a canvas bag with a foam interior or velour soft inside lining which has a zipper on it." During his shift, Olive kept the weapon "on top of our gear in the back of the SUV."

When he fired the launcher at Washington, Olive was approximately 43 to 45 feet away, which was within the recommended range. Olive aimed at Washington's abdomen with the launcher's sighting system, using the same method he had been trained to use. Olive did not see Washington "jump or lurch or levitate" immediately before he fired the launcher. Audio-video footage showed that moments after Olive fired the launcher, he said, "that went high." Olive explained he spontaneously uttered this "[b]ecause … Washington didn't respond in a way I thought he would if I would have struck him in the abdomen." Olive retrieved another round from his vehicle. Olive then discovered the fired round had struck Washington in the face when he approached Washington on the ground and saw he was bleeding from his cheek.

When asked if he would expect an officer with similar training to accurately hit a target 45 feet away in the abdomen, Olive responded, "Absolutely."

2.   *The defense case*

The defendants presented two witnesses in addition to their examination of Olive. Officer Boyan Brkic, an LAPD armorer who created the pilot program to train patrol officers on LAPD's 40-millimeter less-lethal launchers, and Sergeant Michael Hall, the officer in charge of LAPD's firearms training unit who examined and tested the accuracy of the launcher that Olive fired at Washington after the incident.

6

Brkic explained that 40 launchers were used in the training program: nine "first-generation" launchers that the LAPD had used before and 31 new "second-generation" launchers. Both sets of launchers used a mechanical bead sight affixed to the front of the launcher. For the first-generation launchers, the bead sight was screwed into the barrel of the launcher and could be adjusted only with a tool. The second-generation launchers had an additional set screw (also referred to as a tension screw) that "lock[ed] the bead sight in place … [s]o that it cannot be moved upward or downward once the weapon system has been sighted." Unlike the newer version, the first-generation launchers did not have a port to install a set screw for the bead sight; "[t]here was no provision for that additional screw from the manufacturer." The first-generation launchers previously had optic sights that were not part of the launchers' "original" sighting system, but LAPD removed those sights and installed the "original type bead front sight[s]" after the LAPD issued a moratorium on use of optic sights.

Brkic described himself as one of LAPD's "less lethal [weapons] experts" and explained that as an armorer he was "responsible for maintaining, diagnosing problems, issuing weapons, and also the repair of the weapons." Before the training program began, Brkic and other instructors were charged with inspecting the launchers for mechanical issues and "zeroing in" their sighting systems, which refers to the process of adjusting a launcher's bead sight to ensure a fired round impacts the target at the point of aim. If a fired round did not hit the target as intended, the bead sight was adjusted either by "screw[ing] it down to have the round raise up [its] point of impact or … unscrew[ing] the sight elevating it to push the barrel

down and that would lower the point of impact." Brkic testified it cannot be determined whether a launcher is zeroed in by visual inspection, only by firing the weapon.

Brkic trained Olive and other officers on how to use the launchers in June and July 2016, or about a month before the incident. The first phase of training involved classroom lectures and handouts, culminating in a written test. In the second phase, officers handled the launcher and manipulated the rounds. During the third phase, officers learned how to fire the launcher and shot "a qualification course that consisted of five rounds at various distances." Brkic trained officers to aim for the "naval area or belt line" and "to avoid the head, the neck, the spine, and the groin area." He explained that "[a]ny impact on the head area would have been an automatic disqualification" because "we don't want to cause any injury and that's one of the target areas to avoid." Olive earned a perfect score in his qualification course.

Brkic explained that officers "were told to not manipulate the sighting system at all" and that if officers discovered a sighting issue, they were to turn the launcher into the armory. During the training program, no launcher malfunctioned, and out of the approximately 2,000 shots fired from the launchers, no issue ever arose regarding a sighting system becoming misaligned or "going out of zero." Brkic confirmed he was not aware of any problem with the launcher Olive later fired at Washington. After the training program, all 40 launchers were again zeroed in, with some needing readjustment. From there, the launchers were brought to the armory where they were available to be used by LAPD officers.

Brkic testified that aside from the bead sight being misaligned he was not aware of any mechanical issue that could have caused Olive's launcher to malfunction and shoot high. He confirmed that the high shot that hit Washington was "either an error on behalf of Officer Olive or the bead sight was lower than it should have been." Brkic also confirmed the bead sight and launcher remained under LAPD's control after LAPD bought it.

Upon inspecting the launcher after the incident, Hall discovered the bead sight "was lower than it should have been," which in turn caused fired rounds to "impact[] significantly higher than where they should have been impacting." He did not measure how far off the rounds were from their intended targets, only that the launcher "consistently fired high." Hall found the bead sight could be moved with minimal effort and by hand even though it "should be basically unmovable with your hands" and require a tool to adjust. Hall concluded "that when Officer Olive had this weapon, … the bead sight must have been in an improper position with regard to the height that it was."

Hall did not test any of the other 39 launchers. Nonetheless, in a post-incident testing report, Hall noted "it is possible" for the bead sight on the first-generation launchers "to come loose with minimal effort" because those launchers lacked a set screw to secure the sight. He recommended that the bead sight on those launchers be affixed or "glued" in place or that the "9 launchers without the front sight tension screw be removed from the field immediately." He testified that "without knowing how this one became loose, we didn't want to see additional ones becoming loose and changing the height of that front bead resulting in … deployments not hitting the intended target." Hall testified that LAPD did not have any input on the

9

engineering of the launchers, which were manufactured by a third party. Hall was not aware of any other instances where a launcher misfired "similar to what happened with Officer Olive's."

Neither Hall nor Brkic could say when or why the bead sight on Olive's launcher became loose and not zeroed in. Brkic explained, "there's a possibility of a lot of different things happening to the weapon system that would make the front sight go loose. … Maybe handling or in the trunk of a car. Or in handling the way it's stored in the kit room of the police stations." When further prompted, Brkic testified that it "could have been the way it's handled. Could have been the way it's stored. It may have been dropped at some point and no one took it back to the armory." Regardless, Brkic stated that if he "came across a loose bead sight" like the one on Olive's launcher, he would "send it to the manufacturer for repair." He also confirmed, however, that by the time of trial the bead sights on all the LAPD's launchers had been replaced by a "more modern" optic sighting system.

3. *Jury instructions*

Washington asked the court to instruct the jury on the res ipsa loquitur doctrine using CACI No. 417. The court granted the request over the defendants' objection. In turn, the court instructed the jury that:

> Plaintiff Edmond Washington may prove that
> Defendant City of Los Angeles' negligence caused his
> harm if he proves all of the following:

10

1. That Plaintiff Edmon Washington's harm ordinarily would not have happened unless someone was negligent;

2. That the harm was caused by something that only Defendant City of Los Angeles controlled; and

3. That Plaintiff Edmon Washington's voluntary actions did not cause or contribute to the event[s] that harmed him.

If you decide that Plaintiff Edmon Washington did not prove one or more of these three things, you must decide whether Defendant City of Los Angeles was negligent in light of the other instructions I have read.

If you decide that Plaintiff Edmon Washington proved all of these three things, you may, but are not required to, find that Defendant City of Los Angeles was negligent or that Defendant City of Los Angeles's negligence was a substantial factor in causing Plaintiff Edmond Washington's harm, or both.

Defendant City of Los Angeles contends that it was not negligent or that its negligence, if any, did not cause Plaintiff Edmon Washington harm.

11

> If after weighing all of the evidence, you believe that it is more probable than not that Defendant City of Los Angeles was negligent and that his [*sic*] negligence was a substantial factor in causing Plaintiff Edmond Washington's harm, you must decide in favor of Plaintiff Edmond Washington. Otherwise, you must decide in favor of Defendant City of Los Angeles.

The court also denied the defendants' request to instruct on comparative fault using CACI No. 405. The court emphasized the narrow focus of the trial and explained there was no evidence Washington contributed to Olive shooting high and hitting him in the head as opposed to a proper target area on his body.

4. *Closing arguments, motions for directed verdict, and the verdict*

In his closing argument, Washington's counsel argued "either Officer Olive made some kind of mistake or he had a bad weapon. Either way, the City is liable." Counsel emphasized: "There is no evidence that anyone other than the City … or the [LAPD] maintained this weapon. There's no evidence that anyone outside of the LAPD tested this weapon, zeroed it out. There's no third party that came in and somehow modified this weapon. There's positively no evidence that it was given to the [LAPD] by any corporation in a defective condition." Instead, counsel argued, any looseness in the bead sight was "caused by people that were responsible for maintaining and preserving this particular weapon." Counsel argued there was also no evidence showing Washington contributed to his getting shot in the head. To conclude, counsel emphasized that his "burden is met simply

12

by the fact that this man was shot undisputedly and unequivocally in a manner that … he was not supposed to be shot."

In their argument, the defendants focused on Washington's burden of proof, emphasizing he had not presented any evidence showing "how that particular bead sight came loose" or that the City had notice of the condition that was causing the weapon to shoot high. The defendants also argued Washington had not presented any evidence that Olive did not meet the standard of care in firing the launcher or that the City's maintenance of it fell below the standard of care. The defendants argued evidence instead showed Olive acted with reasonable care in firing the launcher and City employees did as well in ensuring the launchers were functioning properly before and after Olive's training. The defendants further argued evidence suggested Olive's first-generation launcher suffered from a manufacturing or design defect as demonstrated by the manufacturer's inclusion of a set screw in the second-generation launcher to hold its bead sight in place.

Washington moved for a partial directed verdict on the issue of the defendants' liability for negligence. He did not address a theory of res ipsa loquitur but argued he was entitled to a directed verdict because the record showed a reasonably well trained LAPD officer would not have shot a suspect in the head. The court denied the motion. The court also denied the defendants' motion for directed verdict based on Washington's failure to present evidence regarding an applicable standard of care and any breach thereof.

After deliberating for an hour, the jury unanimously found Olive was not negligent in aiming the launcher, and by a vote

of 11 to 1, found the City was not negligent in maintaining the launcher. The court entered judgment in the defendants' favor.

5. *Washington's postjudgment motions*

Washington moved for JNOV. He also moved for a new trial under Code of Civil Procedure section 657, subdivision (6), arguing the verdict was supported by insufficient evidence and "against law." For each motion, Washington argued the trial court should grant the requested relief because he established the three conditions of the res ipsa loquitur presumption and no evidence rebutted the defendants' liability. In neither motion did Washington raise an issue of instructional error.

In opposition, the defendants emphasized that Washington had not presented any evidence showing it breached the standard of care and that substantial evidence instead showed its employees acted with due care and a design defect was responsible for the misfire.

In September 2022, after a hearing, the trial court denied the JNOV motion and granted the motion for new trial as to the City. The court first sua sponte determined there had been an instructional error, explaining the res ipsa loquitur instruction incorrectly stated the jury had discretion to determine whether the City was negligent. But the court denied Washington's JNOV motion because "the [instructional] error was invited" by Washington, who proposed the instruction over the City's objection. For the new trial motion, however, the court explained that the jury should have found the City negligent on a res ipsa loquitor theory and that its contrary finding was not supported by the evidence. The court denied the motion as to Olive.

The City and Washington both appealed from the court's postjudgment orders.

14

# DISCUSSION

The City argues the trial court erred in granting Washington's motion for new trial.[4]  In his cross-appeal,

---

[4]      As a threshold issue, the City also argues for the first time on appeal that Washington failed to comply with the claim presentation requirement under the Government Claims Act (Gov. Code, § 810 et seq.) with regard to his allegations of negligent maintenance of the launcher.  (See Gov. Code, § 945.4.)  The City acknowledges it did not raise this argument in the trial court but contends the general forfeiture rule should not apply because pleading claim presentation compliance is an element of the plaintiff's cause of action and an argument for failure to state a claim may be raised for the first time on appeal.  (See *State of California v. Superior Court* (*Bodde*) (2004) 32 Cal.4th 1234, 1243 (*Bodde*) ["plaintiff must allege facts demonstrating or excusing compliance with the claim presentation requirement"]; *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 7, fn. 2 ["the issue of whether a cause of action is stated is not waived by the failure to raise it in the trial court, and it may be raised for the first time on appeal"].)  But Washington generally alleged in his complaint that he complied with the claim presentation requirement before filing suit.  This is sufficient to state a claim.  (*Gong v. City of Rosemead* (2014) 226 Cal.App.4th 363, 374 ["A plaintiff may allege compliance with the claims requirements by including a general allegation that he or she timely complied with the claims statute."]; accord, *Perez v. Golden Empire Transit Dist.* (2012) 209 Cal.App.4th 1228, 1237.)  The City forfeited any claim presentation argument by not raising it in the trial court.  (See *Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 699-700; see also *Bodde*, at p. 1239, fn. 7 [noncompliance with the claim presentation requirement under the Government Claims Act "does not divest the trial court of subject matter jurisdiction over causes of action against public entities"].)  The City's requests for judicial notice

Washington argues the court erred in denying his motion for JNOV as to the City.[5]

A.    *The Doctrine of Res Ipsa Loquitur*

Res ipsa loquitur—Latin for "the thing speaks for itself"—is "an evidentiary rule for 'determining whether circumstantial evidence of negligence is sufficient.' " (*Howe v. Seven Forty Two Co., Inc.* (2010) 189 Cal.App.4th 1155, 1161 (*Howe*); see *Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 825 (*Brown*); Evid. Code, § 646.) " 'The doctrine of res ipsa loquitur is applicable where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the one responsible.' " (*Howe*, at p. 1161.)

In California, res ipsa loquitur is defined by statute as "a presumption affecting the burden of producing evidence." (Evid. Code, § 646, subd. (b); see *Howe, supra*, 189 Cal.App.4th at p. 1161.) To invoke the doctrine, the plaintiff has the burden to produce evidence establishing three conditions: " '(1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; [and] (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.' " (*Howe*, at p. 1161.) If

---

of Washington's presented claim and federal court complaint are denied as unnecessary to resolution of the appeal. (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 613, fn. 29.)

[5]    Washington does not challenge the denial of his postjudgment motions as to Olive.

16

so established, "the doctrine applies and the defendant is presumptively negligent." (*Id.* at pp. 1161-1162; accord, *Brown*, *supra*, 4 Cal.4th at p. 826 ["[t]he presumed fact, in this context, is that 'a proximate cause of the occurrence was some negligent conduct on the part of the defendant' "]; see Evid. Code, §§ 604, 646, subd. (c).)

At that point, "the burden of producing evidence to rebut [the presumption] shifts to the defendant to prove lack of negligence or lack of proximate cause that the injury claimed was the result of that negligence." (*Howe, supra*, 189 Cal.App.4th at p. 1162; see *Newing v. Cheatham* (1975) 15 Cal.3d 351, 364-365 [after the presumption was established, "[i]t then became defendant's obligation to introduce sufficient evidence to sustain a finding either that the accident resulted from some cause other than Cheatham's negligence, or, else, that Cheatham exercised due care in all possible respects wherein he might have been negligent"]; Evid. Code, §§ 604, 646, subds. (b)-(c).) "As a presumption affecting the burden of producing evidence (as distinguished from a presumption affecting the burden of proof), if evidence is presented to rebut the presumed fact, the presumption is out of the case—it 'disappears.' But if no such evidence is submitted, the trier of fact must find the presumed fact to be established." (*Howe*, at p. 1162; see *Newing*, at p. 365; Evid. Code, §§ 604, 646, subd. (c).)

Finally, if the presumptive effect vanishes based on the defendant's evidentiary showing, " 'the jury may still be able to draw an inference that the accident was caused by the defendant's lack of due care from the facts that gave rise to the presumption.' " (*Howe, supra*, 189 Cal.App.4th at p. 1163, quoting Cal. Law Revision Com. com., 29B pt. 2 West's Ann.

17

Evid. Code (1995 ed.) foll. § 646, pp. 198-199; see Evid. Code, § 646, subd. (c)(1).)  But ultimately it is the plaintiff's burden to present evidence showing it is more probable than not that the defendant is negligent and that such negligence was the proximate cause of the accident.  (*Howe*, at p. 1163; accord, *Brown*, *supra*, 4 Cal.4th at p. 826 ["If the defendant introduces 'evidence which would support a finding that he was not negligent or that any negligence on his part was not a proximate cause of the occurrence,' the trier of fact determines whether defendant was negligent without regard to the presumption, simply by weighing the evidence."]; see Evid. Code, §§ 604, 646, subd. (c)(2).)

The Legislature codified the operation of the res ipsa loquitur doctrine and authority for a corresponding jury instruction under Evidence Code section 646, subdivision (c), which states:  "If the evidence, or facts otherwise established, would support a res ipsa loquitur presumption and the defendant has introduced evidence which would support a finding that he was not negligent or that any negligence on his part was not a proximate cause of the occurrence, the court may, and upon request shall, instruct the jury to the effect that: [¶] (1) If the facts which would give rise to a res ipsa loquitur presumption are found or otherwise established, the jury may draw the inference from such facts that a proximate cause of the occurrence was some negligent conduct on the part of the defendant; and [¶] (2) The jury shall not find that a proximate cause of the occurrence was some negligent conduct on the part of the defendant unless the jury believes, after weighing all the evidence in the case and drawing such inferences therefrom as the jury believes are warranted, that it is more probable than not

18

that the occurrence was caused by some negligent conduct on the part of the defendant."

B.    *Motion for JNOV*
  1.    *Standard of review*
  " 'A motion for [JNOV] may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support.' (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)  The standard of review on appeal is the same: 'whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion.' " (*I.C. v. Compton Unified School Dist.* (2025) 108 Cal.App.5th 688, 698; accord, *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770.) "Our determination with respect to the presence of the requisite substantial evidence is de novo." (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 639; accord, *Hirst v. City of Oceanside* (2015) 236 Cal.App.4th 774, 782 ["appellate court must review the record de novo and make an independent determination whether there is any substantial evidence to support the jury's findings"].)

  Where, however, " ' "the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." ' " (*Pruchnik v. JCCP4621 Common Benefit Committee* (2025) 116 Cal.App.5th 35, 47-48; accord, *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465.)  Under these circumstances, "when an appeal turns on the appellant's failure of proof, ' "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a

matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " ' " (*Pruchnik*, at p. 48.)

Further, where the evidence supporting a jury verdict is challenged without a claim of instructional error, we consider the evidence based on the legal standard set forth in the jury instructions.  (See *Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1535 ["where a party to a civil lawsuit claims a jury verdict is not supported by the evidence, but asserts no error in the jury instructions, the adequacy of the evidence must be measured against the instructions given the jury"]; accord, *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 675 ["[a]bsent instructional error, which [defendant] does not argue, for an appellate court to review a verdict under a rule of law on which the jury was not instructed would allow reversal of a judgment on a jury verdict ..., even though neither the jury nor the court committed error"].)  Washington does not challenge the res ipsa loquitur instruction; nor could he given he proposed the instruction and thus invited any error.  (*Mayes v. Bryan* (2006) 139 Cal.App.4th 1075, 1090 [" 'It is an elementary principle of appellate law that "[a] party may not complain of the giving of instructions which he has requested." ' "].)

2.      *The record does not compel a finding in Washington's favor as a matter of law*

The jury was instructed that, even if it determined Washington proved all three conditions of the res ipsa loquitur presumption, "you may, but are not required to, find" that the City was negligent or that its negligence was a substantial factor

20

in causing Washington's harm.  The instruction then further informed the jury that it could find in Washington's favor if, after weighing all the evidence, it believed it was more probable than not that the City was negligent and that the City's negligence was a substantial factor in causing Washington's harm.  The instruction thus provided that the jury's finding as to the City's negligence was not to be controlled by the res ipsa loquitur presumption but rather by the jury's determination as to whether a preponderance of the evidence showed the City was negligent.

This portion of the instruction tracks Evidence Code 646, subdivision (c), and is meant to be provided where the defendant has rebutted the established res ipsa loquitur presumption with evidence tending to show it was not negligent or that its negligence was not a proximate cause of the plaintiff's harm. (Evid. Code, § 646, subd. (c); *Howe, supra*, 189 Cal.App.4th at p. 1162; see also Use Note to CACI No. 417 [the paragraphs "assume that the defendant has presented evidence that would support a finding that the defendant was not negligent or that any negligence on the defendant's part was not a proximate cause of the accident.  In this case, the presumption drops out, and the plaintiff must then prove the elements of negligence without the benefit of the presumption of res ipsa loquitur."].)  As noted, under those circumstances, the jury may draw an *inference* from the plaintiff's evidence that the defendant's negligence was a proximate cause of his harm.  (Evid. Code, § 646, subd. (c)(1); *Howe*, at p. 1163.)  But once the defendant has presented rebutting evidence, the binding *presumption* of negligence " 'disappears,' " and the plaintiff has the burden to present evidence showing it is more probable than not that his harm was

21

caused by the defendant's negligence. (*Howe*, at p. 1162; see Evid. Code, § 646, subd. (c)(2).)

The trial court concluded this portion of the instruction should not have been provided to the jury because the City did not present any evidence rebutting the res ipsa loquitur presumption that Washington had established. The court explained the provided instruction suggested the jury had discretion in its negligence determination whereas the instruction should have informed the jury it was required to find the City negligent if the presumption was established. Even so, the court continued, because Washington proposed the instruction, any instructional error leading to the jury's exercise of improper discretion was invited and could not be used to overturn the verdict.[6]

We agree with this outcome but not the trial court's analysis. Specifically, we disagree with the court's conclusion that the City presented no evidence to rebut the res ipsa loquitur presumption. For instance, the City presented evidence showing Olive was thoroughly trained on how to use the launcher and, because of that training, proficient in its use. Through Olive's testimony, the City also showed that on the day of the incident Olive followed his training and protocols to inspect and fire the

---

[6] Washington seeks to get around the invited error issue by asserting his proposal of the instruction was merely acquiescence to a judicial determination after the court denied his motion for directed verdict. (See *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212 [invited error doctrine "does not apply when a party, while making the appropriate objections, acquiesces in a judicial determination"].) The record shows Washington proposed the instruction *before* he moved for a directed verdict and thus does not support this assertion.

22

weapon. Likewise, Brkic testified that approximately a month before the incident the training instructors inspected the launchers for mechanical issues and test-fired them to ensure their functionality and accuracy. After thousands of rounds were fired from the launchers during the training program, without any sighting system issues, the weapons were again zeroed in to ensure they were properly sighted. Collectively, this is rebutting evidence that tends to prove both that City employees acted with due care in maintaining and using the launcher and that Washington's harm was not caused by the City's negligence. (See *Howe*, *supra*, 189 Cal.App.4th at p. 1162 [" 'If evidence is produced that would support a finding that the defendant was not negligent or that any negligence on his part was not a proximate cause of the accident, the presumptive effect of the doctrine vanishes.' "]; accord, *Brown*, *supra*, 4 Cal.4th at p. 826 ["If the defendant introduces 'evidence which would support a finding that he was not negligent or that any negligence on his part was not a proximate cause of the occurrence,' the trier of fact determines whether defendant was negligent without regard to the presumption"].)[7]

_____

[7] The City also points to evidence showing that, in its post-incident testing, Olive's launcher was firing high based on a misaligned bead sight that was "loose" and that, unlike the first-generation launcher used by Olive, the second-generation launchers were designed with a set screw that securely locked the bead sight into place. The City contends the jury could reasonably infer from this evidence that Washington's harm was caused by something other than its negligence—namely, a defective bead sight for which a third party was responsible. Washington argues the presented evidence was insufficient to allow for such an inference and thus could not serve to rebut the

Because the City presented rebutting evidence, the provided res ipsa loquitur instruction set forth the correct law. Accordingly, we disagree with the trial court's conclusion that Washington's JNOV motion was doomed by invited instructional error. Nonetheless, our review of the record also shows it cannot be said that Washington's evidence of the City's negligence was uncontradicted and unimpeached, much less of a character and weight as to prove such negligence as a matter of law. (*Pruchnik v. JCCP4621*, *supra*, 116 Cal.App.5th at p. 48.) We therefore affirm the denial of his motion.[8]

C.     *Motion for New Trial*
    1.     *Standard of review*

Under Code of Civil Procedure section 657, a new trial may be granted "on all or part of the issues" for any of seven specified grounds "materially affecting the substantial rights of [the aggrieved] party." The sixth ground is: "Insufficiency of the

---

res ipsa loquitur presumption. Ultimately, we need not resolve this dispute. As discussed, the City rebutted the presumption with other evidence showing its employees acted with due care in maintaining and using the launcher and thus were not negligent or the cause of Washington's harm. This alone was sufficient. (See *Howe, supra*, 189 Cal.App.4th at p. 1162 ["if evidence is presented to rebut the presumed fact [that the plaintiff's harm was caused by the defendant's negligence], the presumption is out of the case—it 'disappears' "].)

[8]     For the same reasons, we affirm the denial of Washington's motion for directed verdict. (See *Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 750 [motions for directed verdict and for JNOV "are analytically the same and governed by the same rules"].)

evidence to justify the verdict or other decision, or the verdict or other decision is against law." (Code Civ. Proc., § 657, subd. (6).) If the court grants a new trial, the court must "specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated." (*Id.*, § 657.)

A trial court may grant a new trial for insufficiency of the evidence if "after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the ... jury clearly should have reached a different verdict." (Code Civ. Proc., § 657.) This provides a trial court with broad discretion. (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412; *Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387.) When a court rules on a motion for new trial on this basis, the court sits as an "independent trier of fact" (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 933) and "functions as a thirteenth juror" (*Estate of Elliot* (1952) 114 Cal.App.2d 747, 748), with power "to disbelieve witnesses, reweigh the evidence, and draw reasonable inferences therefrom contrary to those of the trier of fact" (*Mercer v. Perez* (1968) 68 Cal.2d 104, 112).

Generally, where a new trial is granted for insufficient evidence, the order must be affirmed on appeal " 'unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory.' " (*Lane v. Hughes Aircraft Co.*, *supra*, 22 Cal.4th at p. 412.) The standard of review is different, however, where "it appears on appeal that a trial court in granting a new trial based its order exclusively upon an erroneous concept of legal principles applicable to the cause." (*Conner v. Southern Pacific Co.* (1952) 38 Cal.2d 633, 637; accord, *Rickley v. County of Los Angeles*

25

(2004) 114 Cal.App.4th 1002, 1008-1009.)  If such a legal error is shown, an order granting a new trial must be reversed.  (*Conner*, at p. 637 [order reversed upon finding the trial court had granted a new trial based on its mistaken conclusion that jury instructions misstated the law].)

> 2. *The trial court erred in ordering a new trial as to the City*

The new trial order is based on erroneous legal principles. For purposes of the new trial motion, the trial court again determined the jury was incorrectly instructed on the res ipsa loquitur presumption.  The court stated it was not bound by Washington's invited error in considering his new trial motion and that it instead must apply the correct law regardless of the jury instructions.  Even so, the court explained, the jury was required to find the City was negligent because Washington had established the presumption and the City had not presented any rebutting evidence.  The court concluded that the jury's contrary finding was erroneous and prejudicial to Washington.

As discussed, however, the jury was correctly instructed on the res ipsa loquitur doctrine, including that it was not bound by a presumption of negligence.  This part of the instruction was proper because the City presented evidence to rebut the presumption.  In turn, the presumptive effect of the doctrine disappeared, and the jury was required to determine whether Washington had proved the City's negligence by a preponderance of the evidence.  (Evid. Code, § 646, subd. (c); see *Howe, supra*, 189 Cal.App.4th at pp. 1162-1163.)  The trial court erred in disregarding this operation of the doctrine and applying the presumption notwithstanding the City's rebutting evidence.  And in misapplying the applicable legal principles, the trial court

26

abused its discretion in granting a new trial on the ground of insufficient evidence.  (*Conner v. Southern Pacific Co.*, *supra*, 38 Cal.2d at p. 637.)

## DISPOSITION

The postjudgment order is affirmed in part and reversed in part.  The denial of Washington's motion for JNOV is affirmed.  The grant of Washington's motion for new trial as to the City is reversed.  On remand, the trial court shall reinstate the judgment in full.  The defendants are entitled to their costs on appeal.

STONE, J.

We concur:

MARTINEZ, P. J.

FEUER, J.